# United States Court of Appeals
# for the Sixth Circuit
## CASE NO. 21-6028

PLEASANT VIEW BAPTIST CHURCH; PLEASANT VIEW BAPTIST
SCHOOL; PASTOR DALE MASSENGALE; VERITAS CHRISTIAN
ACADEMY; MARYVILLE BAPTIST CHURCH; MICAH CHRISTIAN
SCHOOL; PASTOR JACK ROBERTS; MAYFIELD CREEK BAPTIST
CHURCH; MAYFIELD CREEK CHRISTIAN SCHOOL; PASTOR TERRY
NORRIS; FAITH BAPTIST CHURCH; FAITH BAPTIST ACADEMY; PASTOR
TOM OTTO; WESLEY DETERS and MITCH DETERS, on behalf of themselves
and their minor children MD, WD, and SD; CENTRAL BAPTIST CHURCH;
CENTRAL BAPTIST ACADEMY; PASTOR MARK EATON; CORNERSTONE
CHRISTIAN SCHOOL; CORNERSTONE CHRISTIAN CHURCH; JOHN
MILLER, on behalf of himself and his minor children BM, EM, and HM

Plaintiffs/Appellants

v.

ANDREW G. BESHEAR, in his individual capacity

Defendant/Appellee

On Appeal from the U.S. District Court
for the Eastern District of Kentucky, 2:20-cv-00166

## PLAINTIFFS/APPELLANTS' BRIEF

| | |
|---|---|
| Christopher Wiest (KY 90725) | Thomas B. Bruns (KY 84985) |
| Chris Wiest, Atty at Law, PLLC | Bruns Connell Vollmar & Armstrong |
| 25 Town Center Blvd, Suite 104 | 4555 Lake Forrest Drive, Suite 330 |
| Crestview Hills, KY 41017 | Cincinnati, Ohio 45241 |
| Tel:   513/257-1895 | Tel.:   513/312-9890 |
| chris@cwiestlaw.com | tbruns@bcvalaw.com |

*Attorneys for Plaintiffs/Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, Plaintiffs/Appellants ("Plaintiffs") are not subsidiaries or affiliates of a publicly owned corporation. There is no publicly owned corporation, not a party to the appeal, which has a financial interest in the outcome.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT**........................................... i

**TABLE OF CONTENTS** ........................................................................ ii

**TABLE OF AUTHORITIES** ................................................................. iii

**STATEMENT CONCERNING ORAL ARGUMENT** ........................... v

**JURISDICTIONAL STATEMENT**........................................................1

**STATEMENT OF THE ISSUES**............................................................1

**INTRODUCTION**...................................................................................2

**STATEMENT OF THE CASE AND FACTS** .........................................3

    A. The Plaintiffs..............................................................................3

    B. The Defendant and his orders....................................................5

    C.  This Court repeatedly rebuked this Defendant for violating the Free Exercise Clause when he treated comparable secular activities more favorably than constitutionally protected religious activities, thereby creating clearly established law on the issue.  A U.S. Supreme Court decision in November, 2020, likewise created clearly established law on the issue…………………………………………………………… 8

    D. The November 18, 2020 Orders............................................... 9

**SUMMARY OF THE ARGUMENT** ....................................................12

**ARGUMENT**........................................................................................13

**I.**    **The District Court erred in granting the Defendant's Motion to Dismiss** …………………………………………………..........13

    **A. Standard of Review**..................................................................13

    **B. Defendant Beshear should not be afforded qualified immunity where his violations of the First Amendment's Free Exercise Clause occurred in the face of clearly established case law forbidding his actions**................13

    **C. Defendant Beshear violated clearly established case law and should not be afforded qualified immunity for his violations of the fundamental right to receive a private education**....................................................37

    **D. Defendant Beshear violated clearly established rights regarding Peaceful Assembly and Freedom of Association**....................................38

**CONCLUSION**.....................................................................................40

**CERTIFICATE OF SERVICE** ............................................................40

**CERTIFICATE OF COMPLIANCE**…………………………………41

**APPENDIX -- DESIGNATION OF THE DISTRICT COURT RECORD** ....... i

# TABLE OF AUTHORITIES

## Cases:

*Adkins v. Board of Educ.*, 982 F.2d 952 (6th Cir. 1993)..........................................40

*Anderson v. Creighton*, 483 U.S. 635 (1987).....................................................14, 36

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).....................................................13

*Benner v. Wolf*, 2021 WL 4123973 (M.D. Penn. Sept. 9, 2021).......................31, 33

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)....................................................39

*Bryant v. City of Cayce*, 332 Fed. Appx. 129 (4th Cir. 2009)................................14

*Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887 (6th Cir. 2019)..................................13

*Case v. Ivey*, 542 F. Supp. 3d 1245 (M.D. Ala. 2021)......................................31, 33

*Danville Christian Acad., Inc. v. Beshear*, 141 S. Ct. 527 (2020)………………..38

*DiMarco-Zappa v. Cabanillas*, 238 F.3d 25 (1st Cir. 2001).................................14

*Employment Div. v. Smith*, 494 U.S. 872 (1990)……………………………………38

*Ermold v. Davis*, 936 F.3d 429 (6th Cir. 2019)......................................................30

*Farrington v. Tokushige*, 273 U.S. 284 (1927).......................................................37

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999)...........................................................................................................15

*Hartman v. Acton*, 499 F. Supp. 3d 523, 538 (S.D. Ohio 2020)......................31, 34

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012)........................................................................................................................27

*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002)................................39

*Kauffman v. Anglo–Am. School of Sofia*, 28 F.3d 1223 (D.C. Cir. 1994) ..........14

*Kent v. Oakland County*, 810 F.3d 384 (6th Cir. 2016)..................................*passim*

*Ky. ex rel. Danville Christian Acad., Inc. v. Beshear*, 981 F.3d 505 (6th Cir. 2020) ...........................................................................................................29, 30, 31, 32

*Maryville Baptist Church v. Beshear*, 957 F.3d 610 (6th Cir. 2020).............. *passim*

*Maryville Baptist Church, Inc. v. Beshear*, 977 F.3d 561 (6th Cir. 2020).......*passim*

*Maye v. Klee*, 915 F.3d 1076 (6th Cir. 2019)....................................................35, 36

*Meyer v. Nebraska*, 262 U.S. 390 (1923)………………………………………....37

*Monclova Christian Acad. v. Toledo-Lucas Cty. Health Dep't*, 984 F.3d 477 (6th Cir. 2020)......................................................................................................30, 32

*In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383 (S.D.N.Y. 2021)......................................................................30

*Northland Baptist Church of St. Paul v. Walz*, 530 F. Supp. 3d 790 (D. Minn. 2021)................................................................31, 34

*Ohio Ass'n of Indep. Sch. v. Goff*, 92 F.3d 419 (6th Cir. 1996)..............................38

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020)……….. ………………………………………………………………………………27, 28, 29

*Outlaw v. City of Hartford*, 884 F.3d 351 (2d Cir. 2018)......................................14

*Pearson v. Callahan*, 555 U.S. 223 (2009)...........................................................13

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925)............................................37, 38

*Reiff v. Marks*, 2011 WL 666139 (E.D. Pa. Feb. 23, 2011), aff'd., 511 Fed. Appx. 220 (3d Cir. 2013).................................................................................................14

*Resurrection Sch. v. Hertel*, 11 F.4th 437 (6th Cir. 2021).............................. 29, 30

iv

*Resurrection Sch. v. Hertel*, 16 F.4th 1215 (6th Cir. 2021).....................................30

*Reuber v. United States*, 750 F.2d 1039 (D.C.Cir.1984).........................................14

*Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020)..............................................*passim*

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984).........................................39

*Roman Catholic Diocese v. Cuomo*, 208 L. Ed. 2d 206 (2020).....................*passim*

*Runyon v. McCrary*, 427 U.S. 160 (1976)................................................................37

*Saucier v. Katz*, 533 U.S. 194 (2001)....................................................................13

*Tindle v. Enochs*, 420 Fed. Appx. 561 (6th Cir. 2011).........................................14

*Troxel v. Granville*, 530 U.S. 57 (2000)…………………………………………37

*United States v. Simpson*, 520 F.3d 531 (6th Cir. 2008)..................................31, 32

*Vandiver v. Hardin County Bd. of Educ.*, 925 F.2d 927 (6th Cir. 1991)................38

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012)...............................................9, 15, 21

*Wilson v. Layne*, 526 U.S. 603 (1999)...........................................................*passim*

*Wisconsin v. Yoder*, 406 U.S. 205 (1972)…………………………………….....37

## Other Sources:

Mark Maynard, *As many mitigate restriction damages, gaming venues roll on,*
Kentucky Today, Nov. 20, 2020, available at
https://www.kentuckytoday.com/state/as-many-mitigate-restriction-damages-
gaming-venues-roll-on/article_eca9c5f9-590d-50e3-8c69-6166db2fe517.html
.......................................................................................................................11

Cassidy Morrison, School is safest place for children to be, CDC director says ,
Washington Examiner, Nov. 19, 2020, available at:

https://www.washingtonexaminer.com/news/school-is-safest-place-for-kids-to-be-cdc-director-says.....................................................................................................12

Testimony of Robert Redfield, CDC Director, November 19, 2020, available at: https://www.c-span.org/video/?c4924557/cdc-director-redfield-data-supports-face-face-learning-schools&fbclid=IwAR1Kp3HKvUhZu8CJ1F8tGSISsMtnP0zNDJ3598kSC7sYffb6kDjhKS90zC0 ……………………………………………………..……………………………………………………..12

## STATEMENT CONCERNING ORAL ARGUMENT

This appeal raises significant issues under the First Amendment, including serious concerns about a public official's repeated and unconstitutional conduct provided with qualified immunity even after that same public official blatantly disregarded three published orders directed to him from this Court, which made clear that his actions in treating secular activities more favorably than religiously motivated activities violated the First Amendment's Free Exercise Clause.  Oral argument is thus warranted.

## JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331.   On September 30, 2021 the District Court granted Defendant's Motion to Dismiss, which was a final order. [Opinion and Order, DE#60, PageID#652-667; Judgment, DE#61, PageID#668].   A timely notice of appeal was filed on October 28, 2021. [Notice of Appeal, DE#62, PageID#669-670]. Accordingly, this Court has jurisdiction over Plaintiffs' appeal under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

The appeal presents the following questions:

(1)    Did the Defendant have qualified immunity for his violation of the First Amendment's Free Exercise Clause when he issued a COVID-19 order in November, 2020, which continued into December, 2020, that shutdown religious schools to in-person instruction, but allowed secular and even other religious activities involving a similar COVID-19 risk to continue?

(2)    Did the Defendant have qualified immunity for his violation of the clearly established right to private education when he issued a COVID-19 order in November, 2020, which continued into December, 2020, that shutdown religious schools to in-person

1

instruction, but allowed secular activities and even other religious
activities involving a similar COVID-19 risk to continue?

(3)    Did the Defendant have qualified immunity for his violation of the
clearly established rights regarding freedom of association and
peaceful assembly (including hybrid rights under the Free Exercise
Clause) when he issued a COVID-19 order in November, 2020, which
continued into December, 2020, that shutdown religious schools to in-
person instruction, but allowed secular activities and even other
religious activities involving a similar COVID-19 risk to continue?

## INTRODUCTION

The COVID-19 pandemic tested, some would say assaulted, this country's
commitment to the rule of law like few recent crises have.  This case involves just
such an assault.  This case involves the issuance of a "lockdown" order (also called
the "School Ban") by the Governor of Kentucky, Defendant, Andrew Beshear
("Defendant Beshear"), in November, 2020 and continuing through December,
2020, that shut down religious schools to in-person instruction, all while another
order issued simultaneously allowed many secular activities involving a similar risk
of COVID-19 to continue unimpeded (collectively, the "Orders").  Significant to the
present matter, the Orders were issued ***after*** this Court's decisions in both *Maryville
Baptist Church v. Beshear*, 957 F.3d 610, 616 (6th Cir. 2020) (*Maryville I*) on May

2

2, 2020, and *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) on May 9, 2020 and were issued after Defendant Beshear was informed yet again, in October, 2020, in yet another published decision, that the law in *Roberts* and *Maryville I* was still binding case law in this Circuit. That published decision, *Maryville Baptist Church, Inc. v. Beshear*, 977 F.3d 561 (6th Cir. 2020) (*Maryville II*), was yet another loss for Defendant Beshear on the issue of not treating constitutionally protected activity in a like manner to secular activity where both involve similar COVID-19 risks. Simply put, there is no question of Defendant Beshear's knowledge of this law at the time he issued his Orders, particularly where this law continued in force after the U.S. Supreme Court's decision on November 25, 2020, in *Roman Catholic Diocese v. Cuomo*, 208 L. Ed. 2d 206 (2020).

Despite this record, the District Court granted a motion to dismiss on the basis of qualified immunity. Ultimately, applicable, binding case law from this Court and the Supreme Court compels a contrary result to that reached by the District Court.

### STATEMENT OF THE CASE AND FACTS

<u>The Plaintiffs</u>

The facts here come from Plaintiffs/Appellants' Amended Complaint.[1] The Plaintiffs here (all except for Mitch and Wesley Deters) are pastors who operate

---

[1] The initial Complaint also alleged money damages and asserted the same claims, but the Amended Complaint withdrew certain of the parties, and certain of the claims [DE#40-2, PageID#413-440], and the District Court permitted it to be filed in the same order in which it

religious schools, churches that sponsor religious schools, or religious schools

themselves, all of which are located in Kentucky. (Am. Compl., DE#40-2, ¶¶ 42-

46, 48-49, PageID#423-428).  All of these religious schools and associated

churches operate as extensions of their churches and their church ministries.  In

fact, as part of these schools' curricula, the children have religious education and

chapel service. *Id.*  For all of them, attendance at the school and the instruction

provided by the school are part of the sincerely held religious beliefs of the

congregants of these churches. *Id.*  Because among their sincerely held religious

beliefs is the importance of in-person instruction. *Id.*

   By the fall of 2020, all of them had implemented, at significant cost,

COVID-19 mitigation measures including, without limitation, social distancing,

sanitation, temperature checks, partitions, lunchroom procedures, mask wearing,

and other CDC recommended control measures. *Id.*  And, in none of these schools

or their associated churches was there any evidence of any community spread of

COVID-19. *Id.*

   Plaintiffs also include two sets of parents: John Miller, who served as the

President of the Board for Cornerstone Christian School, who sued on his own

behalf as parent and on behalf of his minor children, BM, EM, and HM; and Mitch

---

dismissed the action.  [Opinion and Order, DE#60, PageID#652-667].  It is the operative
complaint, and facts from it are cited here.

and Wesley Deters, who brought suit on their own behalf and as parents of their minor children who attended the Diocese of Covington schools. These Diocesan schools also were shut down as a consequence of the School Ban. These schools consist of individuals whose practice of the faith includes in-person religious instruction at school, and these schools likewise had COVID-19 risk mitigation measures employed. (*Id.* at ¶¶ 47, 49, PageID#426-427).

Each of the schools, pastors, churches, and parents were unable to fulfill their religious purpose and mission—or implement their religious educational philosophy—and their religious beliefs were substantially burdened, as a result of the prohibition on in-person, in-class instruction to their students. (*Id.* at ¶¶ 50, PageID#428).

<u>The Defendant and his orders</u>

As respects this appeal, Defendant Beshear was sued in his individual capacity. (*Id.* at ¶¶ 5-6, PageID#415). Among other things, Defendant Beshear enforced and was charged with the enforcement or administration of Kentucky's laws under KRS Chapter 39A, KRS Chapter 214 and KRS 220, including the Orders and actions complained of herein. *Id.*

In March, 2020 and in the weeks that followed, Defendant Beshear issued a number of restrictions related to COVID-19. (*Id.* at ¶7, PageID#416). On March 19, 2020, he implemented an outright ban on religious gatherings across the state.

(*Id.* at ¶8, PageID#416).  Specifically, Defendant Beshear, acting through Secretary Eric Friedlander of the Cabinet for Health and Family Services, issued an order stating that "[a]ll mass gatherings are hereby prohibited." *Id.*  In the March 19, 2020, order (the "March order"), Defendant Beshear broadly described the scope of his prohibition as including "any event or convening that brings together groups of individuals, including, but not limited to, community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities." (*Id.* at ¶9, PageID#416).

Thus, the March order, while very broad, specifically banned "faith-based" gatherings by name. (*Id.* at ¶10, PageID#416).  The March order did not define mass gatherings merely based on the number of people coming together, nor did it narrow its prohibition to the kind of indoor or closed-space gatherings that increase the risk of community transmission of the virus. *Id.*  Rather, the March order broadly banned any activity "that brings together groups of individuals," and specifically banned any and all "faith-based" gatherings. *Id.*

However, in an exercise in unconstitutional word play, and due to an unconstitutional value judgment, the March order carved out purely secular activities from the scope of its prohibitions. (*Id.* at ¶11, PageID#416).  Specifically, the March order went on to state that "a mass gathering does not include normal operations at airports, bus and train stations, medical facilities, libraries, shopping

malls and centers, or other spaces where persons may be in transit." *Id.* The March order also stated that a mass gathering "does not include typical office environments, factories, or retail or grocery stores where large numbers of people are present, but maintain appropriate social distancing." (*Id.* at ¶12, PageID#417).

Thus, under the March order, mass gatherings with a faith-based purpose were expressly singled out for prohibition, while mass gatherings with a secular purpose were not—even when those secular purposes involved large numbers of people. (*Id.* at ¶12, PageID#417).

On Good Friday, two days before Easter Sunday, Defendant Beshear held his daily press conference. (*Id.* at ¶14, PageID#417). During his presentation, Defendant Beshear announced that his administration would be taking down the license plate numbers of any person attending an in-person church service on Easter Sunday. *Id.* Then, he said, local health officials would be contacting each person and requiring a mandatory 14-day quarantine. *Id.* Under Kentucky law, violation of the March order was a misdemeanor punishable by criminal prosecution and up to a year in jail. *Id.*

On Easter Sunday, Defendant Beshear acted on his unconstitutional threat. Kentucky State Police troopers, acting on Defendant Beshear's March order, traveled to the Maryville Baptist Church to record license plate numbers of those attending the church's Easter service. (*Id.* at ¶15, PageID#417). The troopers also

7

provided churchgoers with written notices that their attendance at the service **constituted a criminal act**. *Id.*  Afterward, the vehicle owners received letters ordering them to self-quarantine for 14 days or else be subject to further sanction. *Id.*

> This Court repeatedly rebuked this Defendant for violating the Free Exercise Clause when he treated comparable secular activities more favorably than constitutionally protected religious activities, thereby creating clearly established law on the issue.  A U.S. Supreme Court decision in November, 2020, likewise created clearly established law on the issue.

On Saturday, May 2, 2020, and as a result of an emergency appeal, this Court enjoined Defendant Beshear from prohibiting drive-in church services so long as the churches adhered to the same public health requirements mandated for "life-sustaining" entities. *See Maryville I*, 957 F.3d 610, 616.  One week later on Saturday, May 9, 2020, also as a result of an emergency appeal, the Sixth Circuit again enjoined Defendant Beshear (*Roberts*, 958 F.3d 409) and extended *Maryville* to re-open in-person worship in the Commonwealth.

On October 19, 2020, this Court reconfirmed, for the benefit of Defendant Beshear and the public at large, that when it comes to *Maryville* and *Roberts*, "each [is] still binding in the circuit." *Maryville II*, 977 F.3d 561.  Then, on November 25, 2020, the U.S. Supreme Court likewise created further clearly established case law.  In *Roman Catholic Diocese*, 208 L. Ed. 2d 206, the U.S. Supreme Court held that creating categories of favored and unfavored classes of activities during the

COVID-19 pandemic (judged from the perspective of the risk of COVID-19), where religious activities are not treated as a favored class, violates the law.

As an aside, neither *Roberts* nor *Maryville I* were this Court's first foray into on-point case law that should have put all but the most incompetent government official on notice that it was not permissible to engage in discrimination on the basis of religion. That distinction falls to this Court's 2012 decision in *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012).

This law sets the legal backdrop under which Defendant Beshear issued his Orders on November 18, 2020.

### The November 18, 2020 Orders

Despite full knowledge of this clearly established law, on November 18, 2020, Defendant Beshear issued two executive orders: Executive Orders 2020-968 and 2020-969. Both were attached to the Complaint below, as Exhibits A and B. (Am. Compl., DE#40-2 at ¶27, PageID#421).

Executive Order 2020-969 (as previously noted, the "School Ban") prohibited and criminalized in-person instruction for all schools, including private, religious schools, in grades K-12. *Id.* at ¶28. Consequently, the School Ban unconstitutionally infringed on the rights of these Plaintiffs, all of whom include in-school religious education and worship services as part of their sincerely held beliefs. *Id.*

9

While banning in-person religious education and instruction, Defendant Beshear still permitted a number of comparable (from a COVID-19 risk perspective) secular activities involving varying sized groups. *Id.* at ¶29. He permitted childcare programs to continue, including limited duration child care centers,[2] which, depending on the space in the facility, were permitted to have children in group sizes from 15 to hundreds of children. *Id.* at ¶30. Just as schools do, these facilities provided meals for children and ***instructed children in classroom setups identical to schools***. *Id.* These centers were permitted to, and did, provide secular education instruction as part of their programming, including assisting children with school assignments. *Id.*

Defendant Beshear also permitted unlimited sized groups of persons to assemble in businesses and manufacturing facilities with appropriate social distancing. Likewise, classroom instruction could occur in those same settings.[3] *Id.* at ¶31.

---

[2] A limited duration center was a "pop up" center, often hosted by local YMCA's. They were originally set up for the children of "essential" healthcare workers, first responders, and others. *Id.* They had favored status for months and, with the school shutdown, that favored status became even more apparent. *Id.*

[3] https://govsite-assets.s3.amazonaws.com/s47CFNaSK6YhJMGPHBgB_Healthy%20at%20Work%20Reqs%20-%20Manufacturing%20Distribution%20Supply%20Chain%20-%20Final%20Version%203.0.pdf (last visited 7/1/2022).

Defendant Beshear permitted movie theaters to operate, with children in attendance, at 50% capacity.[4] *Id.* at ¶32; PageID#422.  He permitted gyms and fitness centers to operate at 33% capacity. *Id.* at ¶33.  Defendant Beshear permitted auctions to operate at 50% capacity indoors, and unlimited capacity outdoors.[5] *Id.* at ¶34.  Gas stations, grocery stores, retail establishments, and other businesses also were allowed to remain open. *Id.* at ¶35.  Defendant Beshear permitted gaming (gambling) facilities to remain open.[6] *Id.* at ¶36.  Defendant Beshear also permitted secular colleges and universities to remain open. *Id.* at ¶37.

Amazingly, the very day after Defendant Beshear issued Executive Order 2020-969, which as of November 23 closed and criminalized in-person attendance at all public and private elementary, middle, and high schools in the Commonwealth, the director of the CDC announced "[t]he truth is, for kids K-12, one of the safest places they can be, from our perspective, is to remain in school," and that it is "counterproductive . . . from a public health point of view, just in

---

[4] https://govsite-assets.s3.amazonaws.com/0iTtfR0ET2GFa05zMWie_2020-7-1%20-%20Healthy%20at%20Work%20Reqs%20Movie%20Theaters%20-%20Final%20Version%203.0.pdf (last visited 7/1/2022).

[5] https://govsite-assets.s3.amazonaws.com/VTgkgeDSbmgsImOob3lA_2020-7-22%20-%20Healthy%20at%20Work%20Reqs%20-%20Auctions%20-%20Version%203.1.pdf (last visited 7/1/2022).

[6] https://www.kentuckytoday.com/stories/as-many-mitigate-restriction-damages-gaming-venues-keep-rolling,29171 (last visited 7/1/2022).

containing the epidemic, if there was an emotional response, to say, 'Let's close the schools.'"[7] *Id.* at ¶40; PageID#423.

Houses of worship were able continue to operate and could conduct Bible studies any day of the week in enclosed spaces. *Id.* at ¶41. They could also hold Sunday school on their premises in enclosed spaces. *Id.* But, Defendant Beshear refused to allow religious schools to conduct nearly identical activities in, at least for some of these Plaintiffs, ***the exact same spaces***. *Id.*

## SUMMARY OF THE ARGUMENT

The District Court erred in its holding that Defendant Beshear had qualified immunity. Defendant Beshear's shuttering and forbidding in-person instruction at religious schools in November and December 2020, while simultaneously permitting secular activities involving a similar risk of COVID-19 to continue, violated clearly established law under the Free Exercise Clause, including no less than 3 published cases of this Court, against the same Defendant, on virtually the same facts. The District Court's order of dismissal should be reversed.

---

[7] https://www.washingtonexaminer.com/news/school-is-safest-place-for-kids-to-be-cdc-director-says (last visited 7/1/2022).

https://www.c-span.org/video/?c4924557/cdc-director-redfield-data-supports-face-face-learning-schools&fbclid=IwAR1Kp3HKvUhZu8CJ1F8tGSISsMtnP0zNDJ3598kSC7sYffb6kDjhKS90zC0 (last visited 7/1/2022) (CDC Director confirming that all existing data demonstrates K-12 schools are not transmission pathways for the virus, in part due to safety protocols in place in schools).

# ARGUMENT

## I. The District Court erred in granting the Defendant's Motion to Dismiss

### A. Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This standard is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiffs, draw all reasonable inferences in their favor, and accept all well-pleaded allegations in the complaint as true. *Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 897 (6th Cir. 2019).

### B. Defendant Beshear should not be afforded qualified immunity where his violations of the First Amendment's Free Exercise Clause occurred in the face of clearly established case law forbidding his actions.

There is a two-step sequence for resolving a government official's claim to qualified immunity announced in *Saucier v. Katz*, 533 U.S. 194 (2001) and *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  First, a court must decide whether the facts a plaintiff has alleged in his/her complaint make out a violation of a constitutional right. *Id.*  Second, if the plaintiff has satisfied this first step, the court

13

must decide whether the right at issue was "clearly established" at the time of defendant's misconduct. *Id.* To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

In this Circuit, plaintiffs bear the burden of proof in overcoming qualified immunity. [8] That burden is met by plaintiffs when, taking all Complaint allegations as true and construing all reasonable inferences in their favor, plaintiffs demonstrate that constitutional rights were violated by defendants and the rights violated were clearly established at the time of the violation. *Tindle v. Enochs*, 420 Fed. Appx. 561, 563 (6th Cir. 2011). Plaintiffs achieve that by citing to "cases of controlling authority in their jurisdiction at the time of the incident" or "a consensus of cases of persuasive authority such that a reasonable officer could not

---

[8] Five circuits have ruled that the burden of proof on the qualified immunity issue rests with defendants. *See DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 35 (1st Cir. 2001) ("Qualified immunity is an affirmative defense, and thus the burden of proof is on defendants-appellants."); *Outlaw v. City of Hartford*, 884 F.3d 351, 368 (2d Cir. 2018) (same); *Reiff v. Marks*, No. 08–CV–5963, 2011 WL 666139 at *5 (E.D. Pa. Feb. 23, 2011) (same), *aff'd.*, 511 Fed. Appx. 220 (3d Cir. 2013); *Slater v. Deasey*, 789 Fed. Appx. 17, 21 (9th Cir. 2019) (same); *Reuber v. United States,* 750 F.2d 1039, 1057, n. 25 (D.C.Cir.1984), *overruled on other grounds, Kauffman v. Anglo–Am. School of Sofia,* 28 F.3d 1223 (D.C. Cir. 1994) (same). Additionally, the Fourth Circuit holds that defendants bear the burden of proof on the second issue in *Pearson* of plaintiff's constitutional rights not being clearly established at the time of defendants' misconduct. *Bryant v. City of Cayce,* 332 Fed. Appx. 129, 132 (4th Cir. 2009). Plaintiffs should prevail here regardless of which party bears the burden of proof on Defendant Beshear's affirmative defense of qualified immunity. Nevertheless, Plaintiffs respectfully contend that the cases cited above are the better-reasoned decisions on the issue. They raise this issue now, for preservation purposes for *en banc* review, or review in the U.S. Supreme Court.

have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617

(1999); *Kent v. Oakland County*, 810 F.3d 384, 395 (6th Cir. 2016).

Here, and assuming Defendant Beshear is a "reasonable officer," there were

four cases, three of which were decided against Defendant Beshear ***himself*** that

told him his Orders were in violation of clearly established case law.

First, *Ward*, 667 F.3d 727.  In that case, this Court explained that "[i]f the

law appears to be neutral and generally applicable on its face, but in practice is

riddled with exemptions or worse is a veiled cover for targeting a belief or a faith-

based practice," it is not neutral or generally applicable and strict scrutiny applies.

*Id.* at 738.  This Court then found that "[w]hat poses a problem is not the adoption

of an anti-discrimination policy; it is the implementation of the policy, permitting

secular exemptions but not religious ones and failing to apply the policy in an

even-handed, much less a faith-neutral, manner to Ward."  *Id.* at 739.  This Court

then explained that "[a]t some point, an exception-ridden policy takes on the

appearance and reality of a system of individualized exemptions, the antithesis of a

neutral and generally applicable policy and just the kind of state action that must

run the gauntlet of strict scrutiny." *Id.* at 740.  And, citing *Fraternal Order of

Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365-67 (3d Cir.

1999) (Alito, J.) (invalidating a police department policy that barred officers from

growing beards and holding that the policy could not take refuge in the Smith safe

15

harbor because it excepted officers who could not shave for medical reasons but not officers who could not shave for religious reasons), this Court observed that "[a] double standard is not a neutral standard." *Id.*

Second, *Maryville I*, 957 F.3d 610.  In that case, this Court told Defendant Beshear directly, and other governmental actors generally, that "[d]iscriminatory laws come in many forms." *Id.* at 614.  "Outright bans on religious activity alone obviously count." *Id.*  "**So do general bans that cover religious activity when there are exceptions for comparable secular activities**." *Id.* (emphasis added).  "As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Id.*  "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.*

In *Maryville I,* this Court also instructed Defendant Beshear on the issue of permitted activities and exceptions, and observed that "[t]he orders allow 'life-sustaining' operations and don't include worship services in that definition." *Id.* And this Court in *Maryville I* told Defendant Beshear ***how to conduct the comparison***: namely, based on the health risks arising from permitted and prohibited activities rather than the labels attached to those activities: "And many

of the serial exemptions for secular activities pose comparable public health risks
to worship services." *Id.* To avoid any doubt, this Court then provided an example:
"[f]or example: The exception for 'life-sustaining' businesses allows law firms,
laundromats, liquor stores, and gun shops to continue to operate so long as they
follow social-distancing and other health-related precautions." *Id.* "But the orders
do not permit soul-sustaining group services of faith organizations, even if the
groups adhere to all the public health guidelines required of essential services and
even when they meet outdoors." *Id.*

To further avoid any "misunderstanding" in the future, this Court drove
home the point:

> But restrictions inexplicably applied to one group and exempted from
> another do little to further these goals and do much to burden religious
> freedom. Assuming all of the same precautions are taken, why is it safe to
> wait in a car for a liquor store to open but dangerous to wait in a car to hear
> morning prayers? Why can someone safely walk down a grocery store aisle
> but not a pew? And why can someone safely interact with a brave
> deliverywoman but not with a stoic minister? The Commonwealth has no
> good answers. While the law may take periodic naps during a pandemic, we
> will not let it sleep through one. *Id.* at 615.

Perhaps most significantly in *Maryville I,* this Court admonished Defendant
Beshear that the reasons people gather in a particular place have nothing to do with
the risk of contagion analysis (i.e. the risk of COVID-19 spread):

> The Governor claims, and the district court seemed to think so too, that the
> explanation for these groups of people to be in the same area—intentional
> worship—distinguishes them from groups of people in a parking lot or a
> retail store or an airport or some other place where the orders allow many

17

people to be. We doubt that the reason a group of people go to one place has anything to do with it. Risks of contagion turn on social interaction in close quarters; the virus does not care why they are there. So long as that is the case, ***why do the orders permit people who practice social distancing and good hygiene in one place but not another***? If the problem is numbers, and risks that grow with greater numbers, then there is a straightforward remedy: limit the number of people who can attend a service at one time. *Id.* at 615. (emphasis added).

Just a week later, and in response to the absurd argument by Defendant Beshear that *Maryville I* was limited to "drive-in services" (and rejecting Defendant Beshear's argument that he did not need to conduct the comparison analysis that this Court directed in *Maryville I*, but instead only needed to comply with this Court's injunction to permit drive-in worship services) this Court issued its decision in *Roberts*, 958 F.3d 409. In *Roberts*, this Court *again* observed that a "law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities." *Id.* at 413. And again, in *Roberts*, this Court questioned whether "the four pages of exceptions in the orders, and the kinds of group activities allowed, remove them from the safe harbor for generally applicable laws?" *Id.* Not surprisingly, it answered the question: "We think so." *Id.* And it again instructed Defendant Beshear, that, "[a]s a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Id.*

In *Roberts*, this Court again reminded Defendant Beshear that ""[a]t some point, an exception-ridden policy takes on the appearance and reality of a system

of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 413-414. And it again reminded him that "many of the serial exemptions for secular activities pose comparable public health risks to worship services." *Id.* at 414. In other words, and for the second time, this Court instructed Defendant Beshear personally that through his orders, ***he could not treat religious activity less favorably than secular activity if both involve comparable "risks" from a "public health" perspective***. *Id.* Simply put, labels don't matter when all it covers up is a double standard.

In doing the required comparative analysis that Defendant Beshear failed to do, this Court repeated itself: "[t]he exception for 'life-sustaining' businesses allows law firms, laundromats, liquor stores, gun shops, airlines, mining operations, funeral homes, and landscaping businesses to continue to operate so long as they follow social-distancing and other health-related precautions." *Id.* "But the orders do not permit soul-sustaining group services of faith organizations, even if the groups adhere to all the public health guidelines required of the other services." *Id.*

As a result, this Court again admonished Defendant Beshear that "restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom." *Id.* "Assuming

all of the same precautions are taken, why can someone safely walk down a grocery store aisle but not a pew?" *Id.* "And why can someone safely interact with a brave deliverywoman but not with a stoic minister?" *Id.* "The Commonwealth has no good answers." *Id.* "While the law may take periodic naps during a pandemic, we will not let it sleep through one." *Id.* at 414-415.

In rejecting Defendant Beshear's arguments that his orders did not single out religious activity and were not borne of animus, this Court responded that it made no "difference that faith-based bigotry did not motivate the orders," because "[t]he constitutional benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.'" *Id.* at 415. And, in *Roberts*, this Court further explained that "[a] law is not neutral and generally applicable unless there is 'neutrality between religion and non-religion'" and "a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones." *Id.*

Throughout the summer of 2020, Defendant Beshear, in briefing before this Court in the *Roberts* and *Maryville* matters (which had been consolidated), argued that he need not comply with the precedent this Court set in both of those cases because U.S. Supreme Court decisions on injunctions pending appeal from other jurisdictions somehow rendered inapplicable published, binding, case law from this Court. Again, and not surprisingly, this Court disabused him of that notion when, on October 19, 2020 (again, before he issued the Orders here), it issued its decision

in *Maryville II*, 977 F.3d 561. In doing so, this Court observed that both *Maryville I* and *Roberts* were each "still binding in the circuit." *Id.* at 563. And, it reiterated the required comparison in crafting COVID-19 orders (and more generally, evaluation of laws under the Free Exercise Clause), is that "[t]he free exercise inquiry must account for both sides of the equation—the specific limitation on faith-based practices and the comparison of those limitations to similar activities." *Id.* at 565-566.

Were this Court's **four published religious liberty decisions, three of them directed to this very Defendant's COVID-19 orders,** clearly established case law as far as any future COVID-19 restrictions? Were these published decisions, where Defendant Beshear was on the losing end of three of them, sufficient to put a "reasonable officer" on notice that, at a minimum, government has to treat religious activities similarly to secular activities where the COVID-19 risks involved are comparable? How could they not be? Without question they were "cases of controlling authority in their jurisdiction at the time of the incident." *Wilson*, 526 U.S. 603, 617; *Kent*, 810 F.3d 384, 395.

Before turning to Defendant Beshear's November, 2020 Orders, one other decision bears mentioning: The U.S. Supreme Court's decision in *Cuomo*, 141 S. Ct. 63. It was issued on November 25, 2020. We admit, of course, that the Supreme Court's decision in *Cuomo* was exactly one week after Defendant

21

Beshear issued these Orders, but during the period they remained in effect.  This raises two salient points: *Ward*, 667 F.3d 727, *Roberts*, 958 F.3d 409, *Maryville I*, 957 F.3d 610, and *Maryville II*, 977 F.3d 561 were already published and decided law that plainly put Defendant Beshear on notice.  But, if this Court believes *Cuomo*, 141 S. Ct. 63, was the tipping point, then the law was clearly established from November 26, 2020 onward to foreclose qualified immunity after that date.

Like this Court's precedent, the Supreme Court in *Cuomo* confirmed that ***the comparison that must be conducted*** is a general comparison of permitted and unpermitted activities from a COVID-19 risk based perspective.  In doing so, that Court observed that essential businesses in New York, which had no limit on persons who could be admitted, included "businesses … such as acupuncture facilities, camp grounds, garages, as well as many whose services are not limited to those that can be regarded as essential, such as all plants manufacturing chemicals and microelectronics and all transportation facilities." *Id.* at 66.  And in an orange zone (an area with less COVID-19 spread), "[w]hile attendance at houses of worship is limited to 25 persons, even non-essential businesses may decide for themselves how many persons to admit." *Id.*  The Court also observed that "a large store in Brooklyn that could 'literally have hundreds of people shopping there on any given day," while "a nearby church or synagogue would be prohibited from allowing more than 10 or 25 people inside for a worship service." *Id.*

22

Turning to the facts of this case, accepting them as true and construing all reasonable inferences in Plaintiffs' favor, it is clear that Defendant Beshear's School Ban prohibited and criminalized in-person instruction for all schools, including private, religious schools, in grades K-12. (Am. Compl., DE# 40-2 at ¶28). Consequently, Defendant Beshear's School Ban unconstitutionally infringed on the rights of these Plaintiffs, whose sincerely held beliefs include religious education and worship services as part of their educational mission. *Id.*

While banning in-person religious education and instruction, Defendant Beshear simultaneously permitted numerous comparable, from a COVID-19 risk perspective, secular activities of varying, even unlimited, sizes. *Id.* at ¶29. He permitted childcare programs to continue, including limited duration childcare centers, which were permitted, depending upon the space in the facility, to have children in group sizes of 15 up to hundreds of children. *Id.* at ¶30. Just as schools do, these facilities provided meals for children, and instructed children in classroom setups identical to schools. *Id.* These centers were permitted to, and did, provide secular education instruction as part of their programming, including assisting children with school assignments. *Id.*

Defendant Beshear permitted movie theaters to operate, with children in attendance, at 50% capacity. *Id.* at ¶32; PageID#422. He permitted gyms and fitness centers to operate at 33% capacity. *Id.* at ¶33. Defendant Beshear permitted

23

auctions to operate at 50% capacity indoors, and unlimited capacity outdoors. *Id.* at ¶34. Gas stations, grocery stores, retail establishments, and other businesses also remained fully open. *Id.* at ¶35. Defendant Beshear permitted gaming (gambling) facilities to remain open. *Id.* at ¶36. Significantly, Defendant Beshear **permitted secular colleges and universities to remain open**. *Id.* at ¶37.

And, no less than the director of the CDC disagreed with closing K-12 schools, as he announced the very next day after the School Ban took effect: "[t]he truth is, for kids K-12, one of the safest places they can be, from our perspective, is to remain in school," and it is "counterproductive . . . from a public health point of view, just in containing the epidemic, if there was an emotional response, to say, 'Let's close the schools.'" *Id.* at ¶40; PageID#423.

Paying at least some regard to this Court's precedent, Defendant Beshear allowed Houses of worship to continue to operate, and they even could conduct Bible studies any day of the week in enclosed spaces. *Id.* at ¶41. They could also hold Sunday school on their premises in enclosed spaces. *Id.* However, Defendant Beshear's School Ban prohibited religious schools from conducting nearly identical activities in, at least for some of these Plaintiffs, ***the exact same spaces***. *Id.* And, the allegations regarding the experience of these schools, pre-lockdown, were significant: these Plaintiffs held in-person classes since August, 2020 without clusters of COVID-19 or COVID-19 spread within the schools. Why? Because

they had limited class sizes, required masks, sanitized frequently, spread students out in a socially distanced manner, implemented hand-washing requirements and temperature checks, and implemented other CDC best practices. In contrast, plenty of secular activities were allowed to remain open under Defendant Beshear's Orders but without any assurance these CDC best practices were being carried out.

Defendant Beshear argued below that he prohibited all K-12 schools, secular and religious, from having in-person classes and, therefore, this made his Orders neutral or generally applicable. However, that same argument and analysis was repeatedly rejected by this Court in *Roberts,* 958 F.3d 409, *Maryville I*, 957 F.3d 610, and *Maryville II*, 977 F.3d 561. The comparison is not whether Defendant Beshear banned attendance at all religious and secular K-12 schools (although even that did not happen as the label applied to "childcare" or "daycare" doesn't change the fact those facilities continued to function as schools), but rather, as this Court explained, the comparison is to whether the banned and permitted activities engender comparable health risks. *Roberts,* 958 F.3d 409 at 414. ("And many of the serial exemptions for secular activities pose comparable public health risks to worship services.")

As in *Roberts*, here "the Church[es] and [their] congregants just want[ed] to be treated equally." *Id.* at 414. "They don't seek to insulate themselves from the

25

Commonwealth's general public health guidelines." *Id.* "They simply wish to incorporate them into their worship [and education] services." *Id.* "They are willing to [and do] practice social distancing." *Id.* "They are willing to [and do] follow any hygiene requirements." *Id.* "They do not ask to share a chalice." *Id.* "***The Governor has offered no good reason*** for refusing to trust the congregants who promise to use care in [education as an outreach of their] worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same." *Id.* (emphasis added). Thus, "restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom." *Id.* at 414.

"All of this requires the orders to satisfy the strictures of strict scrutiny." *Id.* at 415. "They cannot." *Id.* "At the same time, no one contests that the Governor has a compelling interest in preventing the spread of a novel, highly contagious, sometimes fatal virus." *Id.* "The question is whether the orders amount to "the least restrictive means" of serving these laudable goals." *Id.* "That's a difficult hill to climb, and it was never meant to be anything less." *Id.*

"There are plenty of less restrictive ways to address these public-health issues." *Id.* "Why not insist that the [religious school students] adhere to social-distancing and other health requirements and leave it at that—just as the Governor has done for comparable secular activities?" *Id.* "Or perhaps cap the number of

[students] coming together at one time [just as the Governor did for daycare centers]?" *Id.* "If the Commonwealth trusts its people to innovate around a crisis in their professional lives, surely it can trust the same people to do the same things in the exercise of their faith [at religious schools]." *Id.*

Defendant Beshear's School Ban was violative of the Free Exercise Clause for yet another reason: it violated the clearly established right of religious autonomy. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020). The question presented in *Our Lady of Guadalupe* was whether "the First Amendment permits courts to intervene in employment disputes involving teachers at religious schools who are entrusted with the responsibility of instructing their students in their faith." *Id.* That Court held "[t]he religious education and formation of students is the very reason for the existence of most private schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission." *Id.* As a result, the Court concluded that a religious institution's decision about who educates its children in their religious faith is "an internal church decision that affects the faith and mission of the church." *Id.* at 2062 (*quoting Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012)). It, in other words, is a decision that is "essential to the organization's central mission." *Id.* at 2060. The First Amendment "outlaws . . . intrusion" into such matters. *Id.*

In reaching this conclusion, the Court emphasized the centrality of religious schooling to religious faith. The Court explained that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* at 2064 (emphasis added). "Religious education … is vital to many faiths practiced in the United States." *Id.*

For example, "in the Catholic tradition, religious education is 'intimately bound up with the whole of the Church's life.'" *Id.* at 2065 (quoting Catechism of the Catholic Church 8 (2d ed. 2016)). "Similarly, Protestant churches, from the earliest settlements in this country, viewed education as a religious obligation." *Id.* In fact, "[m]ost of the oldest educational institutions in this country were originally established by or affiliated with churches, and in recent years, non-denominational Christian schools have proliferated with the aim of inculcating Biblical values in their students." *Id.* The Court also discussed the centrality of religious schooling to other faiths, including Judaism, Islam, the Church of Jesus Christ of Latter-day Saints, and Seventh-day Adventists. *Id.* at 2065–66. The Supreme Court thus observed the "close connection that religious institutions draw between their central purpose ***and educating the young in the faith***." *Id.* at 2066. (emphasis added). As such, the Government could no more prohibit religious societies from

conducting in-person classes than it could dictate who can and cannot be employed by them.

Moreover, while Defendant Beshear's School Ban prohibited religious schools from holding in-person classes, he simultaneously permitted religious institutions to hold in-person worship services. The result is that Defendant Beshear declared certain religious activities to be legal—namely, in-person worship—while he declared others to be illegal—specifically, in-person religious schooling. As the clearly established case law demonstrates, the First Amendment forbids this ***direct intrusion*** into the "autonomy" of churches and religious institutions. This case is right in line with *Our Lady of Guadalupe,* and certainly is not distinguishable from *Maryville I*, *Roberts* or *Maryville II*.

<u>The District Court's decision and rationale is unsupportable</u>

The District Court's flawed justification for affording the Governor qualified immunity relied upon this Court's decision in *Ky. ex rel. Danville Christian Acad., Inc. v. Beshear*, 981 F.3d 505, 510 (6th Cir. 2020) and *Resurrection Sch. v. Hertel*, 11 F.4th 437 (6th Cir. 2021). [Opinion, DE#60, pp. 12-16, PageID#663-663]. It did this, even though there were three, earlier published decisions that controlled, and it did this even though this Court clearly repudiated the *Ky. ex rel. Danville*

*Christian Acad., Inc.* decision weeks later in *Monclova Christian Acad. v. Toledo-Lucas Cty. Health Dep't*, 984 F.3d 477 (6th Cir. 2020).[9]

The District Court also cited to *Resurrection Sch.*, 11 F.4th 437, even though this Court granted *en banc* consideration a couple months later and expressly vacated that panel decision.  *Resurrection Sch. v. Hertel*, 16 F.4th 1215 (6th Cir. 2021).

The District Court also commented that other Governors had been granted qualified immunity, but this occurred in completely different contexts (none of them involved, as here, Free Exercise challenges in which that same Governor had been directed by the relevant Circuit Court on how to craft COVID-19 orders and then that same Governor violated this clearly established precedent).   [Opinion,

---

[9] The District Court also suggested that *Cuomo*, 141 S. Ct. 63, could not be relied upon, because it was issued after the Governor's Orders, and suggested in a footnote that "Opinions issued after the issuance of the executive order cannot be relied upon as 'clearly established' if they did not exist at the time the executive order was implemented." (Opinion, DE#60 at PageID#664, fn.8, *citing In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383 (S.D.N.Y. 2021)).  But *Cuomo* was in existence for most of when the order was being implement. And, moreover, that case is plainly distinguishable as those orders occurred and were fully implemented and completed in that case prior to the Supreme Court decision addressing them; it was not, as this case involves, a Supreme Court case being handed down in the early days of a two-month long order, while that order was still in effect.  In contrast, this Court addressed a more analogous factual situation here in *Ermold v. Davis*, 936 F.3d 429 (6th Cir. 2019), in which it denied qualified immunity to a County Clerk who continued her no gay marriage license policy (which was first implemented *prior* to a Supreme Court case), after a Supreme Court case told her its continuation was illegal and unconstitutional.

DE#60, pp. 12-16, PageID#663-663]. The District Court concluded that "[a]fter examining the applicable precedent, particularly in light of a global pandemic, Pleasant View cannot demonstrate that Governor Beshear's issuance of Executive Order 2020-969 violated a clearly established constitutional right, and qualified immunity will be granted on that basis." (Opinion, DE#60, PageID#666). In support, in addition to *Danville* and the now vacated *Hertel* opinion, the District Court cited *Benner v. Wolf*, 2021 WL 4123973, at *5 (M.D. Penn. Sept. 9, 2021); *Case v. Ivey*, 542 F. Supp. 3d 1245 (M.D. Ala. June 1, 2021); *Northland Baptist Church of St. Paul v. Walz*, 530 F. Supp. 3d 790 (D. Minn. Mar. 30, 2021); and *Hartman v. Acton*, 499 F. Supp. 3d 523, 538 (S.D. Ohio 2020).

First, *Ky. ex rel. Danville Christian Acad., Inc.*, 981 F.3d 505 is not a shield for the Governor. That decision deviated from the previous Sixth Circuit decisions in *Roberts*, 958 F.3d 409, and both the *Maryville* decisions, 957 F.3d 610, and 977 F.3d 561. Those three cases all were clear: in a Free Exercise Challenge, the comparison between permitted activities and prohibited activities involves the COVID-19 risk with both. *Id.* Because *Ky. ex rel. Danville Christian Acad., Inc.*, 981 F.3d 505 deviated from the clear instruction provided in the earlier, published decisions in *Roberts*, 958 F.3d 409, and both the *Maryville* decisions, 957 F.3d 610, and 977 F.3d 561, Sixth Circuit case law is clear that those earlier decisions control. *United States v. Simpson*, 520 F.3d 531, 539 (6th Cir. 2008).

Further, to the extent the District Court somehow suggested that the deviation of the panel in *Ky. ex rel. Danville Christian Acad., Inc.*, 981 F.3d 505, from the earlier published decisions in *Roberts*, 958 F.3d 409, *Maryville I*, 957 F.3d 610, and *Maryville II*, 977 F.3d 561, might somehow make the law unclear, this Court has not hesitated to apply the earliest published decision rule in *Simpson*, 520 F.3d 531, 539, in the qualified immunity context, and hold the public official to the requirements of the law as set forth in the earlier published decisions. *King v. Taylor*, 694 F.3d 650, 660, n.7 (6ᵗʰ Cir. 2012).

For yet another reason, *Ky. ex rel. Danville Christian Acad., Inc.*, 981 F.3d 505, cannot help the Governor here: at the time he issued his Orders, he did not have the benefit of that authority.  Said another way, that decision could not have weighed into any analysis of his actions, because it did not exist at the time he issued his Orders.

To make the point even more clear, this Court repudiated the panel decision in *Danville Christian* decision a few weeks later in *Monclova Christian Acad.*, 984 F.3d 477, because, ***just like Defendant Beshear here***, ***that overruled decision failed to account for all of the relevant comparators***.

As noted, the District Court ignored this binding Sixth Circuit caselaw and, instead, cited three factually dissimilar district court decisions involving qualified immunity, all of which are plainly distinguishable.  The first out-of-circuit case

cited by the District Court, *Benner*, 2021 WL 4123973, at \*5, provides no help to Defendant Beshear.  That case did not involve any Free Exercise challenge, or claims of religious discrimination.  *Id.  Benner* also involved a discussion by the District Court that there was no on-point appellate case that would govern that Governor's conduct so as to overcome qualified immunity.  *Id.*  Well, this case, involving three published decisions of this Court directed to this Governor, on the same exact issue, *Roberts*, 958 F.3d 409; *Maryville I*, 957 F.3d 610; *Maryville II*, 977 F.3d 561, makes *Benner* plainly distinguishable.

Next, *Ivey*, 542 F. Supp. 3d 1245, involved a challenge to Governor Ivey's restrictions from the outset of the pandemic.  First, Governor Ivey, unlike Defendant Beshear, treated religious worship as essential and did not substantially burden religious practice.  *Id.*  Further, and unsurprisingly, and with no Eleventh Circuit Court cases on point to suggest that Governor Ivey's order were illegal, the Governor of Alabama was provided qualified immunity.  *Id.*  Again, that is not the factual context here.  Here, when Defendant Beshear crafted his November, 2020 Orders, there were three published decisions of this Court directed to him, on the same exact issue.  *Roberts*, 958 F.3d 409; *Maryville I*, 957 F.3d 610; *Maryville II*, 977 F.3d 561.

Next, *Northland Baptist Church of St. Paul v. Walz*, 530 F. Supp. 3d 790, 807 (D. Minn. Mar. 30, 2021), in which that District Court also observed that

"Plaintiffs have not identified any existing circuit precedent involving sufficiently similar facts to squarely govern the conduct of Governor Walz in his individual capacity." Once again, here, Defendant Beshear had not one, but three published cases, all circuit precedent, and all "involving sufficiently similar facts to squarely govern" his conduct and put him on notice. *Id.*; *Roberts*, 958 F.3d 409; *Maryville I*, 957 F.3d 610; *Maryville II*, 977 F.3d 561.

And, finally, *Hartman v. Acton*, 499 F. Supp. 3d 523, 538 (S.D. Ohio 2020), in which that District Court did not even address the clearly established prong, because it was able to determine that no federal rights were violated since the case involved a general challenge to COVID-19 lockdown orders, and not, for instance, claims of Free Exercise discrimination.

As a reminder, here, Defendant Beshear banned and criminalized the gathering for in-person instruction of K-12 students in all private and religious schools, while he simultaneously permitted the exact same students/children to congregate indoors in unlimited numbers at childcare programs where in-person instruction continued to take place in classroom settings, permitted these same students/children to gather in movie theaters at 50% capacity, permitted these same students/children to gather in gyms and fitness centers which operated at 33% capacity, and permitted secular colleges and universities to remain open for all in-person instruction. (Am. Compl., DE#40-2 at ¶¶ 27-37, PageID#421-423).

And also as noted, the very day after Defendant Beshear issued his Orders the director of the CDC announced "[t]he truth is, for kids K-12, one of the safest places they can be, from our perspective, is to remain in school," and that it is "counterproductive . . . from a public health point of view, just in containing the epidemic, if there was an emotional response, to say, 'Let's close the schools.'" *Id.* at ¶40; PageID#423. And, we plead that the K-12 schools posed similar risks (actually we plead that some of the permitted activities posed a greater risk, from a COVID-19 perspective) to the permitted activities. *Id.* at ¶¶ 65, 70; PageID#431, 432.

Again, *Roberts*, 958 F.3d 409; *Maryville I*, 957 F.3d 610; and *Maryville II*, 977 F.3d 561 were "cases of controlling authority in their jurisdiction at the time of the incident," and these decisions made it clear that Defendant Beshear's Orders violated the law when he issued them. As such, he does not have qualified immunity for his violations of the Free Exercise Clause in November and December, 2020. *Wilson*, 526 U.S. 603, 617; *Kent*, 810 F.3d 384, 395.

And if there is any doubt about Defendant Beshear's lack of qualified immunity, *Maye v. Klee*, 915 F.3d 1076 (6th Cir. 2019) resolves it. There, as here, this Court dealt with the issue of qualified immunity for Defendants who

35

previously had injunctive relief entered against them on virtually identical facts.[10] Not surprisingly, this Court found, in *Maye*, that the prior litigation put the Defendants on notice as to their later conduct.  It found that "[t]he district court's injunctive order in *Dowdy-El* applied to these defendants and concerned virtually identical facts to the scenario that [Defendants] were facing." *Id.* at 1087.  "Put succinctly, reasonable officials follow court orders." *Id.*  Thus, those Defendants did not have qualified immunity. *Id.*

Again, this Court, **in three separate, published decisions** (*Maryville I*, 957 F.3d 610, *Roberts*, 958 F.3d 409, and *Maryville II*, 977 F.3d 561), instructed Defendant Beshear that in crafting any further COVID-19 orders, he could not burden religious activities by treating those activities more restrictively than secular activities he continued to permit where the COVID-19 risks were comparable.  Despite these repeated warnings, Defendant Beshear ignored this Court and, yet again, the Constitution.  These decisions were more than sufficient to make the "contours of the right … sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. 635, 640.

---

[10] Plaintiff/Appellant Maryville Baptist Church was the same Plaintiff in this action as in *Maryville I* and *Maryville II*.

### C. Defendant Beshear violated clearly established case law and should not be afforded qualified immunity for his violations of the fundamental right to receive a private education

Approximately 100 years ago, the United States Supreme Court established in *Meyer v. Nebraska*, 262 U.S. 390 (1923), that parents had the right to direct and control the education of their children, including as to curricula. Two years later, the Court affirmed that right in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). In *Pierce*, as here, the plaintiff provided "secular and religious education and care of children." *Id.* at 532. There, as here, "[s]ystematic religious instruction and moral training according to the tenets of the … Church are also regularly provided." *Id. See, also, Farrington v. Tokushige*, 273 U.S. 284 (1927); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *Runyon v. McCrary*, 427 U.S. 160, 178 (1976).

*Yoder* and *Pierce* dealt with the right of parents to not send their children to public schools and also, in *Pierce*, the right to send their children to private religious schools. So, if parents have a constitutional right to send their children to in-person religious schools, which *Pierce* clearly indicates they do, then the government cannot prohibit that activity in the name of a pandemic where other secular and religious activities raising the same or even greater risks of COVID-19 are allowed to continue. That factual scenario can never satisfy strict scrutiny. Once again, here, Defendant Beshear prohibited in-person instruction in all

37

religious schools, which included the prohibition on in-person exercise of corporate worship in those schools during school hours, but not on Sunday. On these facts, and in light of *Pierce,* Defendant Beshear's actions do not satisfy strict scrutiny.

Because where, as here, the claim is coupled with a Free Exercise challenge, strict scrutiny is applied to restrictions upon private religious schools. *Ohio Ass'n of Indep. Sch. v. Goff*, 92 F.3d 419, 423 (6th Cir. 1996); *Vandiver v. Hardin County Bd. of Educ.*, 925 F.2d 927, 931 (6th Cir. 1991); *Employment Div. v. Smith*, 494 U.S. 872, 881 (1990).

Indeed, even assuming neutrality and general applicability (not the case here), the Supreme Court observed in *Danville Christian Acad., Inc. v. Beshear*, 141 S. Ct. 527 (2020), that *Smith* still requires heightened scrutiny when the "application of a neutral, generally applicable law to religiously motivated action" also implicates "the right of parents" "to direct the education of their children."

The foregoing case law, some dating almost 100 years, was clearly established at the time of Defendant Beshear's most recent unconstitutional actions, thereby depriving him of qualified immunity. *Wilson*, 526 U.S. 603, 617; *Kent*, 810 F.3d 384, 395.

### D. Defendant Beshear violated clearly established rights regarding Peaceful Assembly and Freedom of Association

The right of association is implicated where individuals associate to exercise other First Amendment rights, including the group exercise of religion or of speech. *Roberts v. United States Jaycees*, 468 U.S. 609, 617-618 (1984).  In *United States Jaycees*, the Supreme Court identified two forms of constitutionally-protected associational rights: "freedom of intimate association" and "freedom of expressive association." *Id.*  As the *United States Jaycees* Court observed, this includes association for the exercise of common religious practices. *Id.*

The types of personal relationships that qualify for constitutional protection include educating children. *Id.* at 619; *Johnson v. City of Cincinnati*, 310 F.3d 484, 499 (6th Cir. 2002).  Because *United States Jaycees* is clear that association to educate children is subject to strict scrutiny, and because we know that Defendant Beshear's Orders were not narrowly tailored, this case law also applies to deprive him of qualified immunity.

The prohibition to gather to engage in expressive activity inherently "infringes [on] the group's freedom of expressive association" and "affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).  That is equally true for gatherings and peaceful assembly to engage in religious education.

The foregoing case law was clearly established. *Adkins v. Board of Educ.*, 982 F.2d 952 (6th Cir. 1993) (explaining that the foregoing case law was clearly established for an associational claim).

### Conclusion

The District Court erred in dismissing this case.  Its decision should be reversed.

Respectfully submitted,

/s/Christopher Wiest_____
Christopher Wiest (KY 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
Tel:   513/257-1895
chris@cwiestlaw.com

Thomas B. Bruns (KY 84985)
Bruns Connell Vollmar & Armstrong, LLC
4555 Lake Forrest Drive, Suite 330
Cincinnati, Ohio 45241
Tel.:   513/312-9890
tbruns@bcvalaw.com
*Attorneys for Plaintiffs/Appellants*

### CERTIFICATE OF SERVICE

I have served the foregoing upon the Defendants/Appellees, by electronic mail to their counsel, and through service of this motion via CM/ECF, this 12th day of July, 2022, as well as by filing same with the Court's CM/ECF system this same date.

*/s/Christopher Wiest_____*
Christopher Wiest (KY 90725)

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(g) and 6th Cir. R. 32(a), I certify that this Brief contains 9,324 words. This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

/s/ Christopher Wiest_____

# APPENDIX -- DESIGNATION OF THE DISTRICT COURT RECORD

Plaintiffs/Appellants, pursuant to Sixth Circuit Rule 30(g), designate the

following filings from the district court's electronic record:

| Document Description | Docket Entry No. | PAGEID |
| --- | --- | --- |
| Verified Complaint | DE#1 | 1-44 |
| Motion to Dismiss | DE#35 | 377-400 |
| Motion to Amend | DE#40 | 408-411 |
| Tendered Amended Complaint | DE#40-2 | 413-440 |
| Response to Motion to Dismiss | DE#41 | 441-460 |
| Reply to Motion to Dismiss | DE#42 | 461-480 |
| Response to Motion to Amend | DE#44 | 484-494 |
| Reply to Motion to Amend | DE#46 | 497-511 |
| Opinion and Order | DE#60 | 652-667 |
| Judgment | DE#61 | 668 |
| Notice of Appeal | DE#62 | 669-670 |