# United States Court of Appeals
# for the Sixth Circuit
## CASE NO. 21-6028

PLEASANT VIEW BAPTIST CHURCH; PLEASANT VIEW BAPTIST
SCHOOL; PASTOR DALE MASSENGALE; VERITAS CHRISTIAN
ACADEMY; MARYVILLE BAPTIST CHURCH; MICAH CHRISTIAN
SCHOOL; PASTOR JACK ROBERTS; MAYFIELD CREEK BAPTIST
CHURCH; MAYFIELD CREEK CHRISTIAN SCHOOL; PASTOR TERRY
NORRIS; FAITH BAPTIST CHURCH; FAITH BAPTIST ACADEMY; PASTOR
TOM OTTO; WESLEY DETERS and MITCH DETERS, on behalf of themselves
and their minor children MD, WD, and SD; CENTRAL BAPTIST CHURCH;
CENTRAL BAPTIST ACADEMY; PASTOR MARK EATON; CORNERSTONE
CHRISTIAN SCHOOL; CORNERSTONE CHRISTIAN CHURCH; JOHN
MILLER, on behalf of himself and his minor children BM, EM, and HM

Plaintiffs/Appellants

v.

ANDREW G. BESHEAR, in his individual capacity

Defendant/Appellee

---

On Appeal from the U.S. District Court
for the Eastern District of Kentucky, 2:20-cv-00166

---

## PLAINTIFFS/APPELLANTS' REPLY BRIEF

---

Christopher Wiest (KY 90725)                Thomas B. Bruns (KY 84985)
Chris Wiest, Atty at Law, PLLC              Bruns Connell Vollmar & Armstrong
25 Town Center Blvd, Suite 104              4555 Lake Forrest Drive, Suite 330
Crestview Hills, KY 41017                   Cincinnati, Ohio 45241
Tel:   513/257-1895                         Tel.:   513/312-9890
chris@cwiestlaw.com                         tbruns@bcvalaw.com

*Attorneys for Plaintiffs/Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION………………………………………………………..1

SUMMARY OF THE ARGUMENT ..................................................... 2

ARGUMENT ........................................................................................... 2

    I.      **Defendant Beshear's Executive Order 2020-969, coupled with Executive Order 2020-968 issued on the same date, violated the Free Exercise Clause of the United States Constitution**……..………..........2

    II.    **Defendant Beshear's Executive Order 2020-969, violated the right to a private education**……………………………………………………18

    III.  **Defendant Beshear's Executive Order 2020-969, violated the right to peaceable assembly and association**…………………………………23

CONCLUSION.......................................................................................25

CERTIFICATE OF SERVICE .............................................................26

CERTIFICATE OF COMPLIANCE………………………………..27

i

# TABLE OF AUTHORITIES

**Cases:**

*Anderson v. Creighton*, 483 U.S. 635 (1987)........................................................3, 18

*Brown v. Gilmore*, 533 U.S. 1301 (2001)................................................................15

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).....................................7

*Citizens United v. Federal Election Comm'n*, 558 U. S. 310 (2010).....................24

*Danville Christian Acad., Inc. v. Beshear*, 141 S. Ct. 527 (2020).........................13

*Employment Division v. Smith*, 494 U.S. 872 (1990)..............................................21

*Fulton v. City of Phila.*, 141 S. Ct. 1868 (2021)....................................................20

*Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174 (1996) ...15, 16

*Kent v. Oakland County*, 810 F.3d 384(6th Cir. 2016)......................................3, 17

*Ky. ex rel. Danville Christian Acad., Inc. v. Beshear*,
981 F.3d 505 (6th Cir. 2020)…………………………………………………...*passim*

*King v. Taylor*, 694 F.3d 650 (6th Cir. 2012)...............................................4, 13, 23

*Kissinger v. Bd. of Trs. of Ohio State Univ.*, 5 F.3d 177 (6th Cir. 1993)..........20, 22

*Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020).......*passim*

*Maryville Baptist Church, Inc. v. Beshear*, 977 F.3d 561 (6th Cir. 2020).......*passim*

*Maye v. Klee*, 915 F.3d 1076 (6th Cir. 2019)....................................................17, 18

*Monclova Christian Acad. v. Toledo-Lucas Cty. Health Dep't*,
984 F.3d 477 (6th Cir. 2020)............................................................................11, 12

*Ohio Ass'n of Ind. Sch. v. Goff*, 92 F.3d 419 (6th Cir. 1996)............................18, 19

*Pearson v. Callahan*, 555 U.S. 223 (2009)..............................................................2

ii

*Pleasant View Baptist Church v. Beshear*, 838 Fed. Appx. 938,
2020 U.S. App. LEXIS 40077 (2020)….........................................................13, 14

*Pleasant View Baptist Church v. Beshear*,
2021 U.S. App. LEXIS 9445 (6th Cir. Mar. 31, 2021)...........................................14

*Prater v. City of Burnside*, 289 F.3d 417 (6th Cir. 2002).....................................21

*Radiant Global Logistics, Inc. v. Furstenau*, 951 F.3d 393 (6th Cir. 2020)..........14

*Ramsek v. Beshear*, 989 F.3d 494 (6th Cir. 2021)..................................................25

*Ramsek v. Beshear*, 468 F. Supp. 3d 904 (E.D. Ky. 2020)....................................15

*Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)...............................................24

*Respect Maine PAC v. McKee*, 562 U.S. 996 (2010).......................................15, 16

*Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020)..............................................*passim*

*Roman Catholic Diocese v. Cuomo*, 208 L. Ed. 2d 206 (2020)............................12

*Saucier v. Katz*, 533 U.S. 194 (2001).......................................................................2

*South Bay United Pentecostal Church v. Newsome*, 140 S. Ct. 1613 (2020)...14, 15

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021)...........................................................16

*Teague v. Lane*, 489 U.S. 288 (1989).................................................................15, 16

*Tindle v. Enochs*, 420 Fed. Appx. 561 (6th Cir. 2011)..............................................3

*Trump v. Vance*, 140 S. Ct. 2412, 2432 (2020)......................................................25

*United States v. Simpson*, 520 F.3d 531 (6th Cir. 2008)...............................4, 13, 23

*Vandiver v. Hardin County Bd. of Educ.*, 925 F.2d 927 (6th Cir. 1991)..........22, 23

*Waid v. Earley (In re Flint Water Cases)*, 960 F.3d 303 (6th Cir. 2020)...............26

iii

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012)..............................................................5

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)...............................................23

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
536 U.S. 150 (2002)..................................................................................21, 22, 23

*Watchtower Bible & Tract Soc. of N.Y., Inc. v. Vill. Of Stratton Ohio*,
240 F.3d 533, 562 (6th Cir. 2001)…………………………………………………21

*Wilson v. Layne*, 526 U.S. 603, 617 (1999)........................................................3, 17

**<u>Statutes</u>**:

42 U.S.C. § 1983……………………………………………………………………..2

**INTRODUCTION**

It is human nature to raise your strongest argument first, and then raise less persuasive arguments later.   In his Response Brief (R.21), Defendant Beshear first begins by noting the unprecedented nature of this case because, he claims, it might be the first time that a governor is denied qualified immunity over issuing unconstitutional COVID-19 orders.  With all due respect, what Defendant Beshear really means is that it is his conduct that is unprecedented, some would say unique, among other governors. Consequently, his argument is actually an argument in favor of denying qualified immunity.

The unprecedented reality of a governor repeatedly ignoring a Federal Appellate Court and its orders directed to that governor, regarding COVID-19 restrictions, is highly unusual.  Possibly unique.  Perhaps the most recent analogy for such is to harken back many decades to the painful chapter where certain Southern state governors repeatedly violated the Federal Constitution by enforcing laws that drew harmful, and clearly irrelevant, distinctions based on race, and where the federal judiciary played an important role in ending that lawlessness.  Certainly, there is no recent precedent for such illegal conduct because, at least in this respect, Defendant Beshear is correct: there is no similar example of other governors repeatedly being told to stop breaking the law when issuing COVID-19 orders, but persisting in doing so.   Just because his situation is "unprecedented," and what he

1

did was "unique" as far as 49 other governors are concerned, it does not mean
Defendant Beshear is above the law, above the Constitution, and above 42 U.S.C. §
1983 liability.

## SUMMARY OF THE ARGUMENT

The District Court erred in its holding that Defendant Beshear had qualified
immunity. Defendant Beshear's shuttering and forbidding in-person instruction at
religious schools in November and December 2020, while simultaneously
permitting secular activities involving a similar risk of COVID-19 to continue,
violated clearly established law under the Free Exercise Clause, including no less
than 3 published decisions of this Court, against the same Defendant, on virtually
the same facts. The District Court's order of dismissal should be reversed.

## ARGUMENT

### I.     Defendant Beshear's Executive Order 2020-969, coupled with
Executive Order 2020-968 issued on the same date, violated the Free
Exercise Clause of the United States Constitution

There is a two-step sequence for resolving a government official's claim to
qualified immunity announced in *Saucier v. Katz*, 533 U.S. 194 (2001) and
*Pearson v. Callahan*, 555 U.S. 223, 232 (2009). First, a court must decide whether
the facts a plaintiff has alleged in his/her complaint make out a violation of a
constitutional right. *Id.* Second, if the plaintiff has satisfied this first step, the court
must decide whether the right at issue was "clearly established" at the time of

2

defendant's misconduct. *Id.* To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

This analysis requires that the Court take all Complaint allegations as true and construe all reasonable inferences in Plaintiffs' favor, and then determine whether constitutional rights were violated by defendants and whether the rights violated were clearly established at the time of the violation. *Tindle v. Enochs*, 420 Fed. Appx. 561, 563 (6th Cir. 2011). Plaintiffs can achieve the "clearly established" prong by citing to "cases of controlling authority in their jurisdiction at the time of the incident." *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *Kent v. Oakland County*, 810 F.3d 384, 395 (6th Cir. 2016).

Let us begin with what Defendant Beshear does not, and cannot, dispute. He does not dispute, nor can he dispute, that this Court previously decided ***three published*** Free Exercise cases, which governed his issuance of further COVID-19 orders, at the time he issued his November 2020 COVID-19 orders. Those cases, namely *Maryville Baptist Church v. Beshear*, 957 F.3d 610, 616 (6th Cir. 2020) (*Maryville I*) on May 2, 2020; *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) on May 9, 2020; and *Maryville Baptist Church, Inc. v. Beshear*, 977 F.3d 561 (6th Cir. 2020) (*Maryville II*) on October 19, 2020, all instructed this Defendant that his

3

COVID-19 orders could not treat secular activities more favorably than religious activities where both involved similar risks from a COVID-19 perspective.

In the face of this reality, Defendant Beshear makes a series of misleading arguments. First, he improperly relies on *Ky. ex rel. Danville Christian Acad., Inc. v. Beshear*, 981 F.3d 505, 510 (6th Cir. 2020). "Improperly" is the appropriate descriptive here because *Danville* unquestionably deviated from the clear instruction provided in this Court's earlier, published decisions in *Roberts*, 958 F.3d 409, and both *Maryville* decisions, 957 F.3d 610, and 977 F.3d 561. And, Sixth Circuit case law is clear that those earlier, published decisions control. *United States v. Simpson*, 520 F.3d 531, 539 (6th Cir. 2008).

In fact, even if Defendant Beshear managed to convince the District Court that the deviation by the panel in *Ky. ex rel. Danville Christian Acad., Inc.*, 981 F.3d 505, from the earlier published decisions in *Roberts*, 958 F.3d 409, *Maryville I*, 957 F.3d 610, and *Maryville II*, 977 F.3d 561, might somehow make the law unclear, this Court has not hesitated, in the qualified immunity context, to apply the earliest published decision rule from *Simpson*, 520 F.3d 531, 539, and hold the reasonable public official to the requirements of the law as set forth in the earlier, published decisions. *King v. Taylor*, 694 F.3d 650, 660, n.7 (6th Cir. 2012). Even then, *Ky. ex rel. Danville Christian Acad., Inc.,* could provide no assistance to Defendant Beshear from the date that he issued his orders on November 18, 2020,

4

(Am. Compl., DE#40-2 at ¶27, PageID#421, Exhibits A and B), up to its issuance on November 29, 2020.

But make no mistake, the unreported panel decision in *Ky. ex rel. Danville Christian Acad., Inc.*, 981 F.3d 505, did deviate from this Court's three prior, published decisions in *Roberts*, 958 F.3d 409, *Maryville I*, 957 F.3d 610, and *Maryville II*, 977 F.3d 561.   Defendant Beshear argues against this reality because, allegedly, those prior decisions only dealt with corporate, in-the-pew, church worship.  This argument is false.

First, *Maryville I*, 957 F.3d 610, which was really just an extension of this Court's prior decision in *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012), explained that its scope extended to **any** "religious activity," and not merely to in-the-pew worship, and not merely to gathering to worship.  In *Maryville I*, this Court held the Free Exercise Clause prohibited "**general bans that cover <u>religious activity</u> when there are exceptions for comparable secular activities**." *Maryville I*, 957 F.3d 610 (emphasis added).  Clearly, this Court could have stated it was limiting its holding to church attendance, as Defendant Beshear falsely claims it did, but plainly this Court did not.

In *Maryville I,* this Court unquestionably criticized the fact that "[t]he orders allow 'life-sustaining' operations and don't include worship services in that definition." *Id.*  Then, this Court instructed Defendant Beshear ***how to conduct the***

5

*comparison when crafting any COVID-19 orders in the future*: namely, based on the health risks arising from permitted and prohibited activities rather than the labels attached to those activities, because in this Court's view "many of the serial exemptions for secular activities pose comparable public health risks to worship services." *Id.* To avoid any doubt, this Court then provided a specific example: "[f]or example: The exception for 'life-sustaining' businesses allows law firms, laundromats, liquor stores, and gun shops to continue to operate so long as they follow social-distancing and other health-related precautions." *Id.* "But the orders do not permit soul-sustaining group services of faith organizations, even if the groups adhere to all the public health guidelines required of essential services and even when they meet outdoors." *Id.*

Let us be clear: the *Maryville I* decision, by its plain language, extended to "soul-sustaining group services of faith organizations." 957 F.3d 610. In the present case, that plainly extends to religious education and chapel service conducted as part of a religiously-sponsored school. (Am. Compl., DE#40-2, ¶¶ 42-46, 48-49, PageID#423-428). That is because for these Plaintiffs, "soul-sustaining" services include attendance at the school and the instruction provided by the school, both of which are part of the sincerely held religious beliefs of the congregants of these churches. *Id.* In other words, and taken as true for purposes of Defendant Beshear's Motion to Dismiss, among these Plaintiffs' sincerely held

6

religious beliefs is the importance of in-person instruction. *Id.* See also, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724-725 (2014) (Courts have no basis to second guess adherents' professions of their sincerely held religious beliefs.)

Simply put, there is no good faith argument that *Maryville I* was limited to in-person church worship only. And, to further avoid any "misunderstanding" in the future, this Court drove home its point about religious freedom:

> But restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom. Assuming all of the same precautions are taken, why is it safe to wait in a car for a liquor store to open but dangerous to wait in a car to hear morning prayers? Why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers. While the law may take periodic naps during a pandemic, we will not let it sleep through one. 957 F.3d 610 at 615.

Without question, this blunt pronouncement should have disabused any official, including Defendant Beshear, that what was at issue was not limited to in-the-pew worship. Even in a pandemic, the Constitution applies. *Id.*

Perhaps most significantly in *Maryville I,* at least from the perspective of it being so obvious it shouldn't have to have been said, this Court admonished Defendant Beshear that **the reasons people gather** in a particular place **have nothing to do with a legally appropriate risk of contagion analysis** (i.e. the risk of COVID-19 spread):

> The Governor claims, and the district court seemed to think so too, that the explanation for these groups of people to be in the same area—intentional

worship—distinguishes them from groups of people in a parking lot or a retail store or an airport or some other place where the orders allow many people to be. We doubt that the reason a group of people go to one place has anything to do with it. Risks of contagion turn on social interaction in close quarters; ***the virus does not care why they are there***. So long as that is the case, ***why do the orders permit people who practice social distancing and good hygiene in one place but not another***? If the problem is numbers, and risks that grow with greater numbers, then there is a straightforward remedy: limit the number of people who can attend a service at one time. *Id.* at 615. (emphasis added).

In other words, this Court made clear that its order extended to *any gathering* for religious purposes, as long as permitted secular exceptions involved comparable risks from a COVID-19 perspective.

Just a week later, and in response to the absurd arguments by Defendant Beshear that *Maryville I* was limited to "drive-in services" and, therefore, he asserted did not need to conduct the comparison analysis that this Court directed in *Maryville I* that he had to conduct, this Court soundly rejected his arguments and issued its decision in *Roberts*, 958 F.3d 409.

In *Roberts*, this Court *again* observed that a "law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities." *Id.* at 413. And again, in *Roberts*, this Court rhetorically questioned whether "the four pages of exceptions in the orders, and the kinds of group activities allowed, remove them from the safe harbor for generally applicable laws?" *Id.* Not surprisingly, it answered the question: "We think so." *Id.* And it once again stated the obvious: "[a]s a rule of thumb, the more

exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Id.*

In *Roberts*, this Court again reminded Defendant Beshear that ""[a]t some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 413-414. And it again reminded him that "many of the serial exemptions for secular activities pose comparable public health risks to worship services." *Id.* at 414. In other words, and for the second time, this Court instructed Defendant Beshear personally, that through his orders, ***he could not treat religious activity less favorably than secular activity if both involved comparable "risks" from a "public health" perspective***. *Id.* Simply put, labels don't matter when all they mask is an unconstitutional double standard.

In doing the required comparative analysis that Defendant Beshear failed to do, this Court repeated itself: "[t]he exception for 'life-sustaining' businesses allows law firms, laundromats, liquor stores, gun shops, airlines, mining operations, funeral homes, and landscaping businesses to continue to operate so long as they follow social-distancing and other health-related precautions." *Id.* "But the orders do not permit soul-sustaining group services of faith organizations, even if the groups adhere to all the public health guidelines required of the other

services." *Id.*  So, *Roberts* clearly informed Defendant Beshear that "soul-sustaining group services of faith organizations," could not be substantially burdened by any future COVID-19 orders, where exceptions were allowed, from a COVID-19 risk analysis, for comparable secular activities.

And, in *Roberts*, this Court further explained that "[a] law is not neutral and generally applicable unless there is 'neutrality between religion and non-religion'" and "a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones." *Id.*  Plainly then, this Court did not limit its holding in *Roberts* to in-the-pew worship.

But, in another homage to old habits dying hard, Defendant Beshear rejects this view of well-settled Sixth Circuit law and once again argues that the labels he affixes to activities are what matters, rather than any similarity of risk of COVID-19 spread between permissible secular activities and prohibited religious activities. In other words, so long as he carves out an exception for "in-the-pew" worship, he can prohibit "in-the-classroom" instruction and worship, all while allowing secular instruction to continue in a multitude of settings.  However, if the holdings and rationale in *Roberts*, 958 F.3d 409 and *Maryville I*, 957 F.3d 610 mean anything, Defendant Beshear is wrong again.

A mere month before Defendant Beshear issued the orders sued upon in this case, this Court, in *Maryville II*, re-emphasized the limits of Defendant Beshear's

authority when crafting COVID-19 orders.  Yet again, this Court held that the

comparison was between "the specific **limitation on faith-based practices** and the

comparison of those limitations to similar activities."  *Maryville II*, 977 F.3d 561 at

565-566 (emphasis added).  That analysis in *Maryville II* unquestionably defeats

Defendant Beshear's arguments here, particularly where those arguments

improperly rely on *Ky. ex rel. Danville Christian Acad., Inc*., 981 F.3d 505, and

even on a misunderstanding of that decision.

Specifically, this Court, in *Monclova Christian Acad. v. Toledo-Lucas Cty.

Health Dep't*, 984 F.3d 477 (6th Cir. 2020), observed that its "opinion" in *Ky. ex

rel. Danville Christian Acad., Inc.*, 981 F.3d 505, "said nothing about the question

that the plaintiffs present here: namely, whether an order closing public and

parochial schools violates the Clause if it leaves other comparable secular actors

less restricted than the closed parochial schools."  984 F.3d 477, 481.  And, on that

critical issue of analyzing the comparable activities, not the labels given to them,

this Court, in *Monclova*, observed the following: "the plaintiffs' schools are closed,

while gyms, tanning salons, office buildings, and the Hollywood Casino remain

open." *Id.*

Here, Plaintiffs plead that Defendant Beshear prohibited religious schools

from operating in-person, (Am. Compl., DE#40-2 at ¶28, PageID#421), while he

simultaneously permitted, from a COVID-19 risk perspective, a number of

comparable secular activities to continue.  And, these secular activities involved

varying sized groups, including childcare programs that were permitted to have

children in group sizes from 15 to hundreds of children, ***where those children***

***continued to receive educational instruction in setups identical to schools***. *Id.* at

¶¶ 29,30.

Defendant Beshear also permitted unlimited sized groups of persons to

assemble in businesses and manufacturing facilities where classroom instruction

took place, as long as there was appropriate social distancing.  *Id.* at ¶31.

Likewise, movie theaters were permitted to operate, along with gyms, fitness

centers, auctions, gas stations, grocery stores, retail establishments, and gaming

(gambling) facilities.  Even more significantly, colleges and universities with in-

person classroom instruction continued.  *Id.* at ¶¶ 32-37; PageID#422.

And, this Court, in *Monclova,* yet again made clear that it was *Roberts*,

among other cases, that compelled the comparison between the COVID-19 risk of

the permitted and prohibited activities, not the labels attached to those activities:

"[*Roman Catholic Diocese v. Cuomo*, 208 L. Ed. 2d 206 (2020)] makes clear that

those secular facilities are 'comparable' for purposes of spreading COVID-19. 141

S. Ct. at 66; *see also, e.g., Roberts*, 958 F.3d at 414."  984 F.3d 477 at 482.  So, to

the extent *Ky. ex rel. Danville Christian Acad., Inc.*, 981 F.3d 505 held to the

contrary, it deviated from this well-established law.

That takes us back to *Simpson*, 520 F.3d 531, 539 and *King*, 694 F.3d 650, 660, n.7. *Simpson* involved an analysis of probable cause in a traffic stop, and it observed that the panel was compelled to apply the "the earliest panel holding on point." 520 F.3d 531 at 539. Likewise, *King*, 694 F.3d 650, 660, n.7, was a case involving qualified immunity, and it made clear that a panel split was of no moment in the analysis because the earliest panel decision applied.

Defendant Beshear also argues that this Court's panel decision in an injunction pending appeal posture, *Pleasant View Baptist Church v. Beshear*, 838 Fed. Appx. 938, 2020 U.S. App. LEXIS 40077 (2020) somehow compels the conclusion that this Court must follow the **erroneous holding** of *Ky. ex rel. Danville Christian Acad., Inc.*, 981 F.3d 505, (Brief, R. 21, at 8). Of course, the *Danville* decision that this Court was referring to in *Pleasant View Baptist Church*, 838 Fed. Appx. 938, was not, as Defendant Beshear dishonestly suggests in his brief, this Court's decision in *Ky. ex rel. Danville Christian Acad., Inc.*, 981 F.3d 505.

Rather, in *Pleasant View Baptist Church*, 838 Fed. Appx. 938, this Court, in referring to *Danville*, was referring to the U.S. Supreme Court's determination to deny an injunction pending appeal on reasons other than on the merits. *Danville Christian Acad., Inc. v. Beshear*, 141 S. Ct. 527 (2020).

Specifically, this Court observed that the "Supreme Court in *Danville* declined to address the likelihood that the petitioners would prevail on the merits of their free exercise claims", and it noted "that equitable relief was unwarranted given the limited impact that would result from staying the order" given the pendency of the expiration of the order in a few weeks and the Christmas holiday. 838 Fed. Appx. 938. And, this Court was clear that it was resolving the matter "without engaging on their merits." *Id.*

Defendant Beshear's sleight of hand aside, case law is clear that a decision on a preliminary injunction does not affect later stages in the proceedings. *Radiant Global Logistics, Inc. v. Furstenau*, 951 F.3d 393, 397 (6th Cir. 2020). That's because a preliminary injunction "has no preclusive effect—no formal effect at all—on the judge's decision whether to issue a permanent injunction." *Id.* And the same is true with respect to a non-published decision regarding an injunction pending appeal. In fact, and on that very basis – that the prior decision **would not preclude further litigation** – this Court denied *vacatur* in dismissing the appeal. *Pleasant View Baptist Church v. Beshear*, 2021 U.S. App. LEXIS 9445 (6th Cir. Mar. 31, 2021). This is yet further evidence that Defendant Beshear stubbornly refuses to abandon arguments, or taking actions, this Court has repeatedly rejected.

Defendant Beshear next argues that a single-justice concurrence in *South Bay United Pentecostal Church v. Newsome*, 140 S. Ct. 1613 (2020) shields him

14

from the consequences of his disregard of published decisions from this Court. (Brief, R. 21, at 11).  A few responses are in order.  First, Defendant Beshear made the same misrepresentations regarding the significance of the single justice concurrence in *South Bay* in his arguments before this Court in *Maryville II*.  In response, this Court informed Defendant Beshear that both *Maryville I* and *Roberts* were "each still binding in the circuit."  *Maryville II*, 977 F.3d 561 at 563.

In like manner, Defendant Beshear's argument was rejected by another federal court because his argument "demands too much of the preliminary views of one Justice."  *Ramsek v. Beshear*, 468 F. Supp. 3d 904, 911 (E.D. Ky. 2020). Specifically, he was told that "Justice Roberts' concurring opinion does not create precedent which controls in this case."  *Id.*  That was because, "most importantly, the Court finds significant the procedural context in which the Supreme Court acted."  *Id.*  The District Court in *Ramsek* then instructed Defendant Beshear:

> On review, a denial of injunctive relief pending appeal by the Supreme Court is similar in many ways to a denial of a writ of certiorari. *See, e.g.*, *Teague v. Lane*, 489 U.S. 288, 296, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989); *see also Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1181, 116 S. Ct. 1582, 134 L. Ed. 2d 679 (1996) (Scalia, J. dissenting). Like a denial of writ of certiorari, a variety of considerations underlie a denial of injunctive relief—considerations beyond simply the merits of the case. *See, e.g., Janklow*, 517 U.S. at 1181 (Scalia, J. dissenting) (describing such decisions as "discretionary (and unexplained) denials"); *Brown v. Gilmore*, 533 U.S. 1301, 122 S. Ct. 1, 150 L. Ed. 2d 782 (2001) (Rehnquist, C.J.). Indeed, in *Respect Maine PAC v. McKee*, the Supreme Court explained that to warrant such relief "demands a significantly higher justification than a request for a stay, because unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants

15

judicial intervention that has been withheld by lower courts." 562 U.S. 996 (2010) (cleaned up). The legal principles applied by the Supreme Court in this context lead naturally to a conclusion that, like opinions accompanying the denial of certiorari, opinions accompanying the denial of injunctive relief pending appeal "cannot have the same effect as decisions on the merits." *Teague*, 489 U.S. at 296; *see also Janklow*, 517 U.S. at 1181 (Scalia, J. dissenting) (explaining the impropriety of lower courts possibly giving authoritative effect to a two-Justice opinion concurring in a denial of an injunctive relief pending appeal).

So, multiple courts rejected Defendant Beshear's misapplication of a single Justice concurrence in *South* Bay, yet he persists.

One other observation is in order. *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), unquestionably forecloses the argument that Defendant Beshear's actions were somehow constitutional. Like this Court did in its previous decisions against Defendant Beshear, the Supreme Court made clear that the proper comparison was based upon "the risks various activities pose, not the reasons why people gather." *Id.* at 1296. And "[w]here the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied." *Id.* at 1297. Of course, *Tandon* had not been decided at the time Defendant Beshear issued his orders at issue in this case, and so we do not rely on it under the clearly established prong, but it unquestionably forecloses any argument as to the constitutionality of the orders themselves.

16

So, the issue currently before this Court is simple.  In November, 2020, and with respect to issuing COVID-19 orders, was the law clearly established?   That is, was the legal requirement of making a proper comparison set forth in "cases of controlling authority in their jurisdiction at the time of the incident." *Wilson*, 526 U.S. 603, 617; *Kent*, 810 F.3d 384, 395.  Once again, and with three published decisions of this Court directed to Defendant Beshear, to pose the question is to answer the question.

Defendant Beshear finishes his argument by reiterating that other courts have afforded other governors qualified immunity.  (Brief, R.21 at pp. 14-15). Well, the simple answer is that none of those "other governors" defied three separate published decisions directed to them addressing the exact same subject matter.  Defendant Beshear is unique in that regard, at least when it comes to issuing COVID-19 orders.

And, this Court's decision in *Maye v. Klee*, 915 F.3d 1076 (6th Cir. 2019) is in accord with Plaintiffs' position denying qualified immunity to this Defendant. There, as here, this Court dealt with the issue of qualified immunity for defendants who, on virtually identical facts, previously had injunctive relief entered against them.[1]  Not surprisingly, this Court found that the prior litigation put the

---

[1] Plaintiff/Appellant Maryville Baptist Church was the same Plaintiff in this action as in *Maryville I* and *Maryville II*.

17

defendants on notice as to their later conduct.  It found that "[t]he district court's injunctive order in *Dowdy-El* applied to these defendants and concerned virtually identical facts to the scenario that [Defendants] were facing." *Id.* at 1087.  "Put succinctly, reasonable officials follow court orders."  *Id.*  Thus, those defendants were not entitled to qualified immunity. *Id.*

Defendant Beshear needs to follow published decisions of this Court or face the loss of qualified immunity for refusing to do so.  Again, this Court, ***in three separate, published decisions*** (*Maryville I*, 957 F.3d 610, *Roberts*, 958 F.3d 409, and *Maryville II*, 977 F.3d 561), instructed Defendant Beshear that in crafting ***any*** further COVID-19 orders, he could not burden religious activities by treating those activities more restrictively than secular activities he continued to permit where the COVID-19 risks were comparable.  Despite these repeated orders directed to him as governor, Defendant Beshear ignored this Court and, yet again, the Constitution.  These decisions were more than sufficient to make the "contours of the right … sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. 635, 640.

## II.    Defendant Beshear's Executive Order 2020-969, violated the right to a private education

We have said much of what we need to say on this point in our opening Brief.  Defendant Beshear concedes that there is a right of parents "to send their children to private schools and a constitutional right to select private schools that

offer specialized instruction." (Brief, R. 21, at 15, *citing Ohio Ass'n of Ind. Sch. v. Goff*, 92 F.3d 419, 422 (6th Cir. 1996)). He contends that his orders prohibiting such schools to operate, including a prohibition on conducting group chapel service in connection with such education, did not interfere with this right because his orders were "temporar[y]." And he contends, without explanation, that his order banning private, religious schools did not "interfere with a parent's right to send their children to a private school." (Brief, R. 21, at 15). If shuttering private, religious schools to in-person instruction is not interference, it would be hard to know what would constitute "interference."

Defendant Beshear next raises the straw man argument that Plaintiffs claim the state cannot regulate education in a pandemic. This is another falsehood. As the Amended Complaint makes clear, all of these religious schools and associated churches had implemented, at significant cost, COVID-19 mitigation measures including, without limitation, social distancing, sanitation, temperature checks, partitions, lunchroom procedures, mask wearing, and other CDC recommended control measures. (Am. Compl., DE#40-2, ¶¶ 42-46, 48-49, PageID#423-428). Significantly, in none of these schools or their associated churches was there any evidence of any community spread of COVID-19. *Id.* If Defendant Beshear simply had ordered these steps, the Constitutional right would not have been implicated, because the schools would not have been shut down.

19

And his claim that the "law," here his executive order, applied at every secular school in the Commonwealth, well, that is yet another falsehood. (Brief, R. 21 at 16). Defendant Beshear's orders permitted multiple other settings in which children and young adults gathered in-person, in groups, for educational purposes. These settings included childcare programs providing education in a classroom type setting to children in group sizes from 15 to hundreds of children, and colleges and universities with in-person classes as well. (Am. Compl., DE#40-2 at ¶¶ 29-30, 37, PageID#421-422).

Defendant Beshear then ends with the suggestion that this Court has rejected the hybrid rights theory. But each of the cases he cites plainly is distinguishable. First, *Kissinger v. Bd. of Trs. of Ohio State Univ.*, 5 F.3d 177, 180 (6th Cir. 1993),[2] observed that the challenge "was not aimed at particular religious practices, and did not contain a system of particularized exemptions," and it noted "we will not use a stricter legal standard than that used in Smith to evaluate generally applicable, exceptionless state regulations under the Free Exercise Clause." Here, there are a number of exceptions which Plaintiffs clearly plead. (Am. Compl., DE#40-2 at ¶¶ 29-30, 37, PageID#421-422).

---

[2] Several Justices recently have criticized this Court for its treatment of hybrid rights. *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1915-1916 (2021) (Alito, Thomas, and Gorsuch, *concurring*) ("Some courts have taken the extraordinary step of openly refusing to follow this part of *Smith*'s interpretation," and explaining that this Court was "remarkably blunt").

Next, Defendant Beshear cites *Prater v. City of Burnside*, 289 F.3d 417 (6th Cir. 2002), which was a case involving a Church's demand to a local government for a roadway dedication, in which this Court observed that "the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Id.* at 427. Here, of course, we deal with a challenge about "what the government cannot do to the individual." *Id.* And, this Court concluded that, without any sort of governmental action directed at the church, there was no Free Exercise claim, and thus there could be no hybrid claim. *Id.* at 430. Plainly, that case is not the present case.

And, finally, Defendant Beshear cites *Watchtower Bible & Tract Soc. Of New York, Inc. v. Vill. Of Stratton Ohio*, 240 F.3d 533, 562 (6th Cir. 2001). While it is true that this Court held there was no heightened scrutiny for hybrid rights in *Employment Division v. Smith*, 494 U.S. 872 (1990), and while Defendant Beshear acknowledges that this Court was reversed, he falsely claims that the Supreme Court reversed on other grounds. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150 (2002).

In *Watchtower Bible*, the Supreme Court observed that it was considering a hybrid right: "we consider the door-to-door canvassing regulation not only as it applies to religious proselytizing, but also to anonymous political speech and the distribution of handbills," *id.* at 153. And then, in a footnote, the Supreme Court

21

reminded this Court that heightened scrutiny for hybrid rights in *Smith* was, in fact, the law. *Id.* at 154, fn.8. That same footnote observed that the hybrid right included the Free Exercise Right coupled with the right of parents to direct the education of their children. *Id.*

The Supreme Court also observed in *Watchtower Bible*, that its historical precedents regarding door-to-door canvassing and pamphleteering also touched on religious practices, which it called "more than historical accident," and it then engaged in a robust discussion of the combination of Free Exercise practices and Free Speech practices. *Id.* at 160-162. The Supreme Court found the ordinance offensive to numerous "values protected by the First Amendment." *Id.* at 166. And the Court observed that "requiring a permit as a prior condition on the exercise of the right to speak imposes an objective burden on some speech of citizens holding religious or patriotic views." *Id.* at 167. Without question, that discussion would not have been necessary if there were no hybrid right, and we submit the Supreme Court overturned this Court's analysis on hybrid rights in *Watchtower Bible.*

At bottom, *Kissinger*, 5 F.3d 177, 180, and any later cases that suggest a hybrid right does not raise strict scrutiny, cannot be squared with *Vandiver v. Hardin County Bd. of Educ.*, 925 F.2d 927, 931 (6th Cir. 1991), which was decided earlier, and observed that "[t]he *Smith* decision implies without stating that those

hybrid claims which raise a free exercise challenge coupled with other constitutional concerns remain subject to strict scrutiny." *Id.* at 933.

Again, since the earliest published panel decision controls, *Simpson*, 520 F.3d 531, 539, and that extends to issues of qualified immunity. *King*, 694 F.3d 650, 660, n.7, *Vandiver*, 925 F.2d 927, 931, controls, and there is a hybrid right. And, in any event, the Supreme Court's decision in *Watchtower Bible*, 536 U.S. 150, reversing this Court's determination that there was no such right, forecloses arguments to the contrary.

### III.    Defendant Beshear's Executive Order 2020-969, violated the right to peaceable assembly and association

Here, Defendant Beshear rests his argument regarding peaceful assembly and association on his false claim that the regulation at issue was content-neutral. To this end he cites *Ward v. Rock Against Racism*, 491 U.S. 781, 792 (1989). He is wrong. Under Defendant Beshear's orders, if the purpose of gathering was to educate children in a daycare setting, there was no violation of his orders; yet, if these exact same children gathered to engage in religiously based education, there was a violation. (Am. Compl., DE#40-2 at ¶¶ 29-30, 37, PageID#421-422). That situation is the epitome of content-based restrictions, because they depended upon who was doing the speaking and educating, and the purpose of the gathering. Again, things that were/are entirely irrelevant to the spread of the virus.

23

Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* "Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163-164.

"Because strict scrutiny applies either when a law is content based on its face, or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Id.* at 166. "Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter. *Id.* For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* at 169.

Because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," *Citizens United v. Federal Election Comm'n*, 558 U. S. 310, 340 (2010), the Supreme Court has insisted that "laws favoring some speakers over others demand strict scrutiny when the legislature's

speaker preference reflects a content preference," *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 658 (1994). "Thus, a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based." *Reed*, 576 U.S. 155, 170. Moreover, "characterizing a distinction as speaker based is only the beginning—not the end—of the inquiry." *Id.*

Here, Defendant Beshear's orders singularly were focused on the purpose of the gathering and the speech that occurred within them. Again, take this example: in a church building, if they gathered children for the purpose of daycare and the speech associated with it, the gathering was lawful. If they gathered for in-the-pew worship and the speech associated with it, the gathering was lawful. But if they gathered to study and instruct K-12 students, in matters both secular and religious, it was not. To say that was a content neutral restriction is utterly absurd. It is, rather, another example of this Governor's "quintessential violation of the rights of free speech and assembly." *Ramsek v. Beshear*, 989 F.3d 494, 499 (6th Cir. 2021). The District Court's judgment and decision to the contrary should be reversed.

## Conclusion

"In our system of government, as this Court has often stated, no one is above the law. That principle applies, of course, to a [Governor]." *Trump v. Vance*, 140 S. Ct. 2412, 2432 (2020). This Court has previously, and recently, denied qualified

immunity to a Governor based on his misconduct in office in contravention of the Constitution. *Waid v. Earley (In re Flint Water Cases)*, 960 F.3d 303, 330-332 (6th Cir. 2020). So we know that there is no gubernatorial exception to Qualified Immunity. Just as Governor Snyder did in *Waid*, Governor Beshear also violated clearly established law. The District Court erred in dismissing this case and affording Governor Beshear qualified immunity. Its decision should be reversed.

<div style="margin-left:40%">

Respectfully submitted,

/s/Christopher Wiest_____
Christopher Wiest (KY 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
Tel:   513/257-1895
chris@cwiestlaw.com

Thomas B. Bruns (KY 84985)
Bruns Connell Vollmar & Armstrong, LLC
4555 Lake Forrest Drive, Suite 330
Cincinnati, Ohio 45241
Tel.:   513/312-9890
tbruns@bcvalaw.com
*Attorneys for Plaintiffs/Appellants*

</div>

## CERTIFICATE OF SERVICE

I have served the foregoing upon the Defendants/Appellees, through service of this Reply Brief via CM/ECF, this 24 day of August, 2022.

<div style="margin-left:40%">

*/s/Christopher Wiest_____*
Christopher Wiest (KY 90725)

</div>

**CERTIFICATE OF COMPLIANCE**

As required by Fed. R. App. P. 32(g) and 6th Cir. R. 32(a), I certify that this Reply Brief contains 6,256 words. This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

/s/ Christopher Wiest_____